UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>    Defendants. | Civil Action No. 10-0148 (JEB) |

## MEMORANDUM OPINION

Plaintiff John Doe worked as a scientist for Research Support Instruments ("RSI"), a subsidiary of government contractor Physical Sciences, Inc. ("PSI"). During the course of an experiment, he alleges, he was exposed to the pathogen causing Bovine Spongiform Encephalopathy, commonly known as "mad-cow disease." As a result, Plaintiff brings this *pro se* action against RSI, PSI, and the United States seeking $15 million in damages for negligence, intentional and negligent infliction of emotional distress, strict liability, and Constitutional torts under the Fifth Amendment. RSI and PSI now jointly move to dismiss for failure to state a claim, and PSI separately moves to dismiss for lack of personal jurisdiction. The Court agrees that Plaintiff has failed to raise a cognizable issue, obviating any need to decide the jurisdictional question.[1]

**I.    Background**

RSI provides engineering and scientific services to the Naval Research Laboratory ("NRL") in Washington, D.C. Plaintiff, who holds a Ph.D. in physics, was employed as a

---

[1] The Court has reviewed Defendants' Motions, Plaintiff's Opposition, and Defendants' Reply.

scientist at RSI between August 2006 and August 2008. Second Am. Compl. at 8. During this period, Plaintiff worked "exclusively for NRL and on NRL site [*sic*]," where his job entailed "developing a [research] method . . . ." Id.

Plaintiff alleges that, in March 2007, his supervisor "told [Plaintiff] about his intention to involve in research [*sic*] on Mad-Cow disease in collaboration" with the National Veterinary Services Laboratory ("NVSL") in Ames, Iowa. Id. at 9. According to Plaintiff, "the plan was to perform the same type of . . . measurements on Mad-Cow disease samples as [Plaintiff] performed on [other materials] . . . to see if . . . [the] method can distinguish between brain tissue infected with Mad-Cow disease and healthy brain tissue." Id. Shortly thereafter, Plaintiff's supervisor allegedly gave him "an envelope . . . containing four [tissue] samples," two of which contained mad-cow disease and the other two contained healthy tissue. Id. Plaintiff claims that when he asked his supervisor about "the risk and . . . safety procedures," he was told "just not to eat the samples." Id.

Plaintiff alleges he performed the experiments on the samples as requested, and, upon completion, he informed his supervisor that "the results of the experiment [] did not show any difference between infected and not-infected [*sic*] samples . . . ." Id. at 10. At a subsequent meeting, Plaintiff attempted to "justify his time [working on the experiments] and show the results to the group leader," but he was ignored by the group leader, who "conspicuously turned his head away and changed the subject." Id. Plaintiff was "puzzled by [this] behavior," and asserts it was at this time that he "[began] to realize something [was] wrong about the Mad-Cow experiment." Id.

Approximately two weeks later, Plaintiff met with the microbiologist of the research group who was responsible for "the safe handling of biological materials." Id. at 10-11. When

Plaintiff explained that he had performed experiments on the mad-cow disease samples, the microbiologist "answered right away in a somewhat scared voice: 'if they find out, they are going to close [the] lab.'" Id. at 11. Plaintiff surmised that "the Bio-safety commission at NRL [had] never evaluated the experiment," and as a result he had unwittingly taken part in a "**clandestine experiment**" that was "not authorized." Id. (emphasis in original). Furthermore, during a group discussion on an unrelated matter a year later in March 2008, Plaintiff claims he learned that "it was very likely that the [experiment] . . . sprayed pieces of mad-cow infected tissue into the air." Id.

Plaintiff concludes that he invariably would have "ingested and breathed such pieces of infected tissue" because he conducted the experiment over a period of "eight hours in [a] small room within five feet of the [mad-cow disease] samples." Id. at 11-12. Upon seeking medical advice about his alleged exposure to mad-cow disease, Plaintiff reports that he was told by an infectious disease specialist that:

> (1) [t]he disease is extremely rare and poorly understood; (2) [t]here is no cure and no treatment for such disease . . . ; (3) [t]he disease[] [is] 100% fatal, and the one year before death, when the symptoms appear, is brutal; (4) [t]he incubation time . . . can be decades; (5) [t]here are no tests that can be employed before the very last stage of the disease when the symptoms appear . . . . The diagnosis is done at autopsy.

Id. at 13-14.

Plaintiff has brought this suit for negligence, intentional infliction of emotional distress, negligent infliction of emotional distress, and an alleged violation of his rights under the Fifth Amendment; he additionally seeks to hold Defendants strictly liable for engaging in abnormally dangerous activity. Id. at 6, 20-51. Plaintiff demands $15 million in damages and injunctive relief in the form of medical monitoring. Although the United States has answered, RSI and PSI

3

have filed a Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim and 12(b)(2) for lack of personal jurisdiction.

**II.     Legal Standard**

To survive a motion to dismiss under Rule 12(b)(2), Plaintiff bears the burden of "establishing a factual basis for the [Court's] exercise of personal jurisdiction over the defendant." Crane v. New York Zoological Society, 894 F.2d 454, 456 (D.C. Cir. 1990) (citing Reuber v. United States, 750 F.2d 1039, 1052 (D.C. Cir. 1984), rev'd on other grounds by Kauffman v. Anglo-American School of Sofia, 28 F.3d 1223 (D.C. Cir. 1994)). To meet this burden, Plaintiff "must allege specific facts connecting the defendant with the forum." Capital Bank Int'l Ltd. v. Citigroup, Inc., 276 F. Supp. 2d 72, 74 (D.D.C. 2003) (citing Second Amendment Foundation v. U.S. Conference of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001)).

In determining whether a basis for personal jurisdiction exists, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff." New York Zoological Society, 894 F.2d at 456 (citing Reuber, 750 F.2d at 1052). Unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." When the sufficiency of a complaint is challenged under Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v.

4

United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms. Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

The notice pleading rules are "not meant to impose a great burden on a plaintiff." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005). But while "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted). The Court need not accept as true, however, "'a legal conclusion couched as a factual allegation,'" nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949. Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 555 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

**III.   Analysis**

Defendants argue that, even if Plaintiff could make out the elements of the counts alleged, all are barred by the District of Columbia's Workers' Compensation Act ("WCA"). D.C. Code § 32-1501, *et seq.* The Court agrees.

A. The WCA

Defendants correctly argue that the claims against RSI fall within the exclusive parameters of the WCA. The statutory language is unambiguous in its directive that the WCA encompasses all claims and remedies for workplace injuries against employers. See D.C. Code § 32-1504. Section 32-1504(a) expressly provides that "[t]he liability of an employer [under the WCA] shall be exclusive and in place of all liability of such employer to the employee . . . on account of [an alleged workplace injury]." (emphasis added). Moreover, § 32-1504(b) makes clear that "[t]he compensation to which an employee is entitled under this chapter shall constitute the employee's exclusive remedy against the employer . . . for any illness[] [or] injury . . . arising out of and in the course of his employment." (emphasis added).

Courts in this District have interpreted the text of the WCA literally. See Vanzant v. WMATA, 557 F. Supp. 2d 113, 117 (D.D.C. 2008) ("The WCA is the exclusive remedy for a workplace injury."); Legesse v. Rite Aid Corp., 2007 WL 1191827, at *2 (D.D.C. 2007) ("The [WCA] is the exclusive remedy for individuals injured in the workplace . . . ."); Everson v. Medlantic Healthcare Group, 414 F. Supp. 2d 77, 86 (D.D.C. 2006) ("The [WCA] provides the exclusive remedy for any workplace injury . . . .") (emphasis added). These holdings are entirely consistent with the District of Columbia's long-established "rule that there can be no separate recovery [beyond the WCA] where the underlying injury is covered by the [WCA]." Tredway v. District of Columbia, 403 A.2d 732, 735 (D.C. 1979). The WCA is typical among workers' compensation statutes in both its exclusivity provisions and its breadth. Id. at 735 n.7 (noting that relief provided by workers' compensation legislation generally is a replacement for common law benefits); see also Brown v. Curtis & Johnson, Inc., 117 F. Supp. 830, 831 (D.D.C. 1954) ("The liability of the employer under the Act is exclusive," and "[t]he very purpose of the

6

[WCA] is to substitute [relief under the WCA] for the commonlaw [*sic*] cause of action for damages."); Hicks v. Allegheny East Conference Ass'n of Seventh-Day Adventists, Inc., 712 A.2d 1021, 1022 (D.C. 1998) ("In short, workers' compensation is a substitute for any liability of the employer to an employee who otherwise would be entitled to recover damages from such employer at law on account of [an] injury or death suffered by the employee.") (emphasis added) (internal quotation marks omitted).

It is unsurprising, then, that the WCA preempts an employee's suit against an employer for common law tort claims arising during the course and scope of employment. See Dominion Caisson Corp. v. Clark, 614 A.2d 529, 533 (D.C. 1992) (declaring that under workers' compensation schemes, "the employer receives tort immunity," and the employee "giv[es] up the right to sue the employer") (internal quotation marks omitted); Myco, Inc. v. Super Concrete Co., 565 A.2d 293, 298 (D.C. 1989) ("[U]nder the exclusivity provision of the Act the employer cannot be liable in tort to [an] employee for [an] injury . . . ."). It is equally well established that the WCA "extends to claims for emotional distress or mental anguish where the underlying cause or tort is covered by the WCA." Legesse, 2007 WL 1191827, at *2 (citing Tredway, 403 A.2d at 735); see also Estate of Underwood v. National Credit Union Admin., 665 A.2d 621, 631 (D.C. 1995) (stating that "the trial court ordinarily will not have jurisdiction over [claims involving] emotional distress . . . based on the acts of a supervisor or co-worker"); Tatum v. Hyatt Corp. 918 F. Supp. 5, 8 (D.D.C. 1994) (holding that common law tort claims for intentional infliction of emotional distress are preempted by WCA).

Given this broad coverage, Plaintiff must rely on a narrow exception to the WCA. The only workplace injuries falling outside the purview of the WCA are "'injuries specifically intended by the employer to be inflicted on the particular employee who is injured.'" Vanzant,

7

557 F. Supp. 2d at 117 (quoting Clements v. Ace Cash Express, Inc., 2005 WL 1490005, *1 (D.D.C. 2005)). In other words, "the WCA specifically covers injuries that are the result of willful and intentional conduct of . . . a fellow employee . . . so long as the employer did not intend those parties' actions." Id. (emphasis in original); see also Tatum. 918 F. Supp. at 8 (granting summary judgment to defendant because common law claims, including intentional infliction of emotional distress, were predicated on actions of fellow employee, which employer did not intend); Grillo v. Natl. Bank of Wash, 540 A.2d 743, 744 (D.C. 1988) (holding that "only injuries specifically intended by the employer to be inflicted on the particular employee who is injured fall outside of the exclusivity provisions of the WCA").

Plaintiff cannot squeeze his claims into this exception. This is particularly so because the relevant decisional law has narrowly interpreted it. Specific intent by the employer will not be found even where an employer has knowledge to a "substantial certainty" that an injury will result from an act. Clements, 2005 WL 1490005, at *1 n.3 (citing Grillo, 540 A.2d at 751). Moreover, workplace injuries caused by the intentional acts of third parties demonstrate specific intent on the part of an employer only where the employer and a third party conspired to injure an employee. Id. (citing Grillo, 540 A.2d at 748); see also Rustin v. District of Columbia, 491 A.2d 496, 502 (D.C. 1985) (finding no proof of specific intent by employer).

Even accepting as true Plaintiff's allegations that he unknowingly participated in a "clandestine experiment," Defendants' argument is strengthened rather than weakened. Second Am. Compl. at 11. Under this theory, Plaintiff's coworkers purposefully bypassed established safety protocol regarding the experiments with the intention of keeping their activities a secret. If so, the experiment leading to his alleged exposure was carefully designed so that RSI would never learn of it. RSI, it follows, cannot be said to have intended Plaintiff's injury. It is thus

clear from Plaintiff's own assertions that RSI neither conspired with a third party to injure him, nor possessed any degree of knowledge – much less knowledge to a substantial certainty – that Plaintiff would be exposed to tissue infected with mad-cow disease.

Plaintiff's invocation of Chung v. Lee, 852 F. Supp. 43 (D.D.C. 1994), and District of Columbia v. Thompson, 570 A.2d 277, 286 (D.C. 1990), rev'd in part on other grounds, 593 A.2d 621 (1991), do not undercut Defendants' position. These cases do not, as Plaintiff argues, stand for the proposition that the WCA exempts an injured employee from its provisions where the employee did not lose wages. Instead, Chung and Thompson merely illustrate the distinction between an "injury" and a "disability" under the WCA: one can recover for disability under the WCA only if the injury leading to the disability results in a loss of wages. See D.C. Code § 32-1501(8). The cases nowhere suggest that all other forms of workplace injury without wage loss are outside the scope of the Act.

In sum, Plaintiff "'completely misconceives the purpose and function of [workers' compensation laws]; the whole theory of . . . compensation legislation[] is to provide the injured workman with certain and absolute benefits in lieu of All [*sic*] common law damages.'" Tredway, 403 A.2d at 735 n.7 (quoting Haynes v. Rederi A/S Aladdin, 362 F.2d 345, 350 (5th Cir. 1966)). Plaintiff's claims against RSI are thus barred by the WCA's explicit requirements.

### B. Personal Jurisdiction Over PSI

PSI argues that the Court lacks personal jurisdiction over it, given that it is a Massachusetts corporation with its principal place of business in Andover, Massachusetts. See Motion at 4. Plaintiff responds that he can pierce PSI's corporate veil or otherwise demonstrate that RSI is merely the alter ego of PSI, thus making personal jurisdiction appropriate over PSI.

9

The Court need not resolve this issue because, even if Plaintiff could satisfy the applicable veil-piercing standard, all claims against PSI would then similarly be barred by the WCA.

It should be preliminarily noted that PSI misstates the test for veil-piercing under District of Columbia law. See Defendants' Reply at 7-8. It would certainly be to PSI's benefit if courts still required a showing that an entity "'use[d] the corporate form to perpetrate fraud or wrong.'" Id. (quoting Vuitch v. Furr, 482 A.2d 811, 815 (D.C. 1984)) (citing McAuliffe v. C. & K. Builders, 142 A.2d 605, 607 (D.C. 1958)), but that is no longer the case. Indeed, this is the exact point the Court in Vuitch made when it explicitly discarded the restrictive standard applied in McAuliffe: "More recently, the court has held that considerations of justice and equity can justify piercing the corporate veil and has rejected the contention that . . . there must be a showing of fraud . . . ." 482 A.2d at 815. The core thrust of Vuitch is to explain how the veil-piercing principle has evolved into a doctrine of equity under which "the decision to pierce will be influenced by [many] considerations." Id. at 816. The existence or nonexistence of fraud is of course relevant to the inquiry, but "the factor [that] predominates will vary in each case." Id.

Properly enunciated, the veil-piercing doctrine requires "(1) unity of ownership and interest [between the entities], and (2) [either] use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." McWilliams Ballard, Inc. v. Broadway Management Company, 636 F. Supp. 2d 1, 8 (D.D.C. 2009) (quoting Estate of Raleigh v. Mitchell, 947 A.2d 464, 470 (D.C. 2008)) (citations and internal quotation marks omitted). A commonly referenced, though not exhaustive, list of factors for determining when veil-piercing is appropriate includes "'(1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled . . . , (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect [an entity] from the

10

claims of creditors.'" McWilliams, 636 F. Supp. 2d at 8 (quoting Mitchell, 947 A.2d at 470-71 (quoting Bingham v. Goldberg. Marchesano. Kohlman. Inc., 637 A.2d 81, 93 (D.C. 1994))). Far from the rigid doctrine Defendants intimate, "the ultimate principle [of veil piercing] is one permitting its use to avoid injustice." United States v. Andrews, 146 F.3d 933, 940 (D.C. Cir. 1998) (internal quotation marks omitted).

Even under the appropriate veil-piercing test, it is not at all obvious that Plaintiff meets his burden. For purposes of this Motion, however, the Court will consider Plaintiff's allegations in the light most favorable to him and assume he could pierce PSI's corporate veil. Yet this helps Plaintiff not at all. Whether RSI and PSI are or are not distinct corporate entities does not affect Plaintiff's ability to bring claims against an employer for an alleged workplace injury sustained within the course and scope of his employment in the District of Columbia. The WCA would still stand as an insuperable barrier. Whether it is due to a lack of personal jurisdiction or because of the preemptive effect of the WCA, the conclusion must be the same: Plaintiff cannot sue PSI in this Court.

## IV. Conclusion

Because Plaintiff's claims are barred by the WCA, the Court need not consider the other defenses Defendants assert to particular counts. The Court, accordingly, will grant Defendants' motion to dismiss. A separate Order accompanies this Memorandum Opinion.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: July 15, 2011